# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

LINDA A. SHIELDS,

                    Plaintiff,

          v.                                                            Case No.  06-CV-1314

MATRIX ABSENCE MANAGEMENT, INC.,
AURORA HEALTH CARE LONG TERM DISABILITY PLAN,
AURORA HEALTH CARE, and
DELPHI FINANCIAL GROUP, INC.

                    Defendants.

# ORDER

On December 26, 2006, plaintiff Linda Shields filed suit against defendants Matrix Absence Management, Inc. ("Matrix"), Aurora Health Care Long Term Disability Plan (the "Plan"), Aurora Health Care ("Aurora"), and Delphi Financial Group, Inc. ("Delphi").  Shields, a former employee of Aurora and a beneficiary under the Plan, alleges that the Plan's independent administrator, Matrix (whose parent company is Delphi), did not follow the proper procedures in reviewing her claim for long term disability ("LTD") benefits.  She claims Matrix ignored all of the evidence demonstrating her disability, and denied her claim without substantial evidence.  Defendants argue that Matrix did not ignore the evidence demonstrating her disability, but simply found it unconvincing, and found other evidence to the contrary more convincing.  Both sides filed motions for summary judgment which are now before the court.  Additionally, within defendants' Motion for Summary Judgment is a request for dismissal of all defendants other than the Plan itself.  For the reasons

set forth herein, defendants' request for dismissal of all defendants other than the Plan is granted, defendant's Motion for Summary Judgment is denied, and plaintiff's Motion for Summary Judgment is granted.

## I.   BACKGROUND

Shields began her employment at Aurora on November 26, 2001, as a Project Leader in the Systems Development Department. (Debofsky Decl. Ex. A at 48). Her job required her to oversee up to fifteen other employees (Defs.' Resp. Pl.'s PFF ¶ 10), sit up to 80% of the day, and perform fine hand manipulation when using a computer keyboard.   (Debofsky Decl. Ex. A at 49-50).

In February of 2003, Shields began seeing Dr. Horner-Ibler for treatment of fibromyalgia. (*Id.* Ex. C at 221). Then, in April 2003, she was admitted to the hospital complaining of depression, at which point Dr. Rohr found that she had a twenty to thirty year history of depression. (*Id.* Ex. C at 296-97).   Plaintiff left work due to alleged disability on April 19, 2003, and began receiving short term disability benefits. (*Id.* Ex. D at 318).   In June 2003, she filed for LTD benefits listing her ailments as: "pain, mental lapse, inability to concentrate, panic attacks, depression, chronic fatigue, hand and leg pain, variable fibromyalgia pain, and migraine headaches." (*Id.* Ex. D at 313-14).

A beneficiary under Aurora's plan is eligible for LTD benefits only if Matrix finds that the requirements for disability have been met.   A beneficiary can receive LTD benefits for up to twenty-four months if the administrator finds the beneficiary is unable – due to illness, injury, accident, or infectious disease, as established by

Case 2:06-cv-01314-JPS   Filed 09/24/08   Page 2 of 25   Document 55

objective medical evidence – to perform her own job. (*Id.* Ex. A at 9). This is known as the "own occupation" provision. If, after the initial twenty-four month period, the beneficiary cannot engage in "any occupation for which [she] [is] reasonably fitted by education, training and/or experience, she will be considered totally disabled." (*Id.*). This is known as the "any occupation" provision. If a beneficiary is totally disabled, she may receive LTD benefits until the earliest of: the end of the maximum benefit period; recovery; or death. (*Id.*).

During June and July of 2003, Matrix reviewed plaintiff's medical records. On August 7, 2003, Matrix prepared a Long Term Disability File Review in which the reviewer – citing plaintiff's admission to the hospital for depression, as well a report and a memo from Dr. Rohr detailing plaintiff's depression – recommended that plaintiff receive LTD benefits under the own occupation provision. Though plaintiff presented some evidence of fibromyalgia when applying for these benefits, it is clear from the record that Matrix approved plaintiff's application because of her depression. Thus Matrix classified her benefits as falling under the "mental/nervous" provision of the plan. (*Id.* Ex. C at 297). This provision states in part:

> Your first twenty-four (24) months of LTD benefits will be paid if you are disabled for the treatment of a mental/nervous or substance abuse disability on an outpatient or inpatient basis. LTD benefit payments will not exceed twenty-four (24) months for these disabilities. However, if you are confined in a hospital or institution at the end of your twenty-four (24) month disability benefit period, your monthly benefit will continue during your confinement.

(*Id.* Ex. A at 9) (emphasis omitted). On August 13, 2003, Matrix notified plaintiff that her application for disability benefits had been approved under the "mental/nervous" provision, that her effective date of LTD benefits was July 11, 2003, and that she would soon receive a disability check for the period from July 11 - 31st. (*Id.* Ex. C at 293). There is no indication in the record that plaintiff appealed this decision.

Throughout 2003 until the end of her twenty-four month disability period in July 2005, plaintiff continued to seek treatment for her fibromyalgia and its attendant ailments. On May 13, 2003, she sought treatment for her fibromyalgia from Dr. Mortensen, who increased her Kadian (a morphine sulfate) prescription to 60 mg. (*Id.* Ex. B at 189). Shortly thereafter, on June 23, 2003, Shields had a follow-up visit with Dr. Horner-Ibler, who referred her to Mark Schrager, a rheumatologist familiar with the treatment of fibromyalgia. (*Id.* Ex. B at 132-33). As part of Matrix's investigation into Shields's original claim of disability, Dr. Rohr completed a Matrix medical certification and work status report on July 3, 2003, stating Shields could not work due to psychiatric disorder, fibromyalgia, and chronic pain syndrome. (*Id.* Ex. C at 246). A few weeks later, on July 28, 2003, Dr. Rohr wrote a letter on Shields's behalf which essentially stated the same things as were in the aforementioned report, but just added "irritable bowel syndrome" ("IBS") to the list of her ailments. Throughout the rest of 2003, plaintiff continued to regularly see Dr. Horner-Ibler for her fibromyalgia, and plaintiff began seeing Cynthia Solliday-McRoy, PhD, who provided plaintiff psychotherapy for coping with her fibromyalgia. (*Id.* Ex. C at 204). Throughout these visits with Drs. Solliday-McRoy and Horner-Ibler, both often made

Case 2:06-cv-01314-JPS   Filed 09/24/08   Page 4 of 25   Document 55

note of the extreme pain and difficulties plaintiff reported. (*Id.* Ex. B at 126-29, 197-199).

Plaintiff applied for Social Security disability benefits, as required by the Aurora Plan, in January of 2004. (*Id.* Ex. D at 369-79). On March 17, 2004, Dr. Rohr dictated a disability report in response to a mental health questionnaire on Shields. (*Id.* Ex. B at 177). He stated that her depressive illness was aggravated by her fibromyalgia and migraine syndrome. (*Id.*). Also, in a section of the report in which he detailed his observations of Shields, he noted that she had diminished ability to concentrate and impaired short-term memory. (*Id.*). Less than a month later, on April 5, 2004, plaintiff visited Dr. Horner-Ibler with complaints of chronic pain, fibromyalgia and urinary tract retention, the latter, the doctor estimated, was a side effect of plaintiff's pain medication (Kadian - 60 mg). (*Id.* Ex. B at 123). On April 2, 2004, Shields was notified by the Social Security Administration ("SSA") that it had found her to be "disabled" as defined in the Social Security Act, specifically 42 U.S.C. § 423(d)(1)(A). (Defs.' Resp. Pl.'s PFF ¶ 37). The SSA found that she had been disabled since April 11, 2003. (Debofsky Decl. Ex. D at 363).

On December 7, 2004, plaintiff underwent a pre-surgical evaluation attendant to breast implant replacement surgery (there were concerns that silicone leakage could be exacerbating her fibromyalgia). (*Id.* Ex. B at 117). A muscoskeletal exam performed as part of the evaluation showed tender points at her elbows, shoulders, knees and hips. (*Id.* Ex. B at 119). On January 14, 2005, Matrix sent plaintiff a

Case 2:06-cv-01314-JPS   Filed 09/24/08   Page 5 of 25   Document 55

reminder that her twenty-four months of LTD benefits under the "mental/nervous" provision would expire on July 10, 2005. (*Id.* Ex. D at 323).

Shields visited Dr. Hartlaub on July 15, 2005, due to problems with her IBS; Dr. Hartlaub felt her IBS could be "getting out of control" and thus referred her to a gastroenterologist. (*Id.* Ex. B at 114). Then, as Shields's benefits had expired, she contacted Matrix on July 26, 2005, and asked if the administrator would review her medical records for consideration of disability under the "any occupation" provision of the plan. (*Id.* Ex. D at 324). Two days later, Shields was examined by Dr. Mortensen who found she had multiple trigger points, and it was his impression these resulted from fibromyalgia. (*Id.* Ex. A at 97). Plaintiff then saw Dr. Smith on August 1, 2005; Dr. Smith noted Shields had all tender points characteristic of fibromyalgia. (*Id.* Ex. A at 94). Dr. Smith further recommended an MRI because of plaintiff's worsening headaches, and recommended Vicodin for pain control and headaches. (*Id.*). A few days later, plaintiff saw Dr. Halverson, a rheumatologist, who examined her and found her to be tender all over. (Defs.' Resp. Pl.'s PFF ¶ 29). On September 2, 2005, plaintiff saw Dr. Vakil because of problems with her IBS, which was alternating between diarrhea and constipation; Dr. Vakil noted she was on all known IBS medications. (Debofsky Decl. Ex. A at 75-76). On the same day, Dr. Halverson wrote a letter to Matrix stating that Shields's fibromyalgia caused her chronic moderate to severe pain, and that there was no expectation of meaningful improvement in her condition. (*Id.* Ex. A at 82). A few months later, Dr. Halverson followed up with another letter confirming that she was diagnosed using the

-6-

18-tender points test, which is the only test available to confirm the diagnosis of fibromyalgia. (*Id.* Ex. E at 403).

As part of Matrix's decision-making process as to whether to grant Shields LTD benefits under the "any occupation" provision, it requested Dr. Ladin, a Board Certified Independent Medical Examiner, to conduct an Independent Medical Record Review of plaintiff's medical records. (Wilson Letter of 1/10/08 Ex. 2). Dr. Ladin's report, dated October 5, 2005, details Shields's extensive medical history, states that she appears to be suffering from fibromyalgia, along with depression and IBS, but concludes that there is no objective basis for finding Shields to be disabled from any occupation. (*Id.*). Nine days later, Matrix contacted Lawrence Mayer, a Vocational Rehabilitation Consultant, to conduct a Transferable Skills Analysis/Labor Market Survey Report. (Br. Supp Defs.' Mot. S.J. Ex. 3). Mayer's October 26, 2005 report makes it clear that he accepted Dr. Ladin's finding that "the records do not document any objective basis for restricting [Shields's] activities in a work setting." (*Id.* Ex. 3 at 2). Thus, Mayer analyzed Shields's pertinent vocational information, and found numerous jobs in the Milwaukee area for which Shields was qualified. (*Id.* Ex. 3). There is no mention in Mayer's report of any effect Shields's conditions of fibromyalgia, depression, and IBS might have on her ability to obtain or retain any of the enumerated jobs.

After reviewing the records of Shields's treating physicians, Dr. Ladin's Independent Medical Record Review and Mayer's vocational report, Matrix denied Shields's claim for long term disability benefits under the "any occupation" provision

of the Plan on October 27, 2005. (*Id.* Ex. 4). Shields appealed Matrix's initial determination on April 6, 2006. (Pl.'s Resp. Defs.' PFF ¶ 21). Shields submitted additional items to Matrix on May 30, 2006. (*Id.* ¶ 22). These items consisted of: a letter from Dr. Halverson expressing his opinion that Shields's condition would persist permanently; a "vocational assessment report" by a Mr. Riley; a letter from Dr. Solliday-McRoy expressing her opinion that Shields is precluded from working in any job; and the letter from the SSA awarding her disability benefits. (Wilson Letter of 1/10/08 Exs. 5, 6, & 7); (Pl.'s Resp. Defs.' PFF ¶ 22). Donovan Radach, a Nurse Case Manager for Matrix, and Nancy Leonard, a Senior Client Services and Technical Consultant for Matrix, reviewed Shields's file, and ultimately decided on July 12, 2006, that there was "no objective medical findings that would preclude [Shields] from performing seated work that is within the scope of [her] education, experience, and training", thus Matrix upheld the denial of benefits. (Wilson Letter of 1/10/08 Ex. 8 at 3; *Id.* Ex. 11).

## II. ANALYSIS

### A. Jurisdiction

Jurisdiction properly lies in this court pursuant to 29 U.S.C. §§ 1132(e)(1)&(f) – provisions of the Employee Retirement Income Security Act ("ERISA") of 1974 which grant district courts jurisdiction to hear civil matters brought to recover benefits due under the terms of an employee welfare benefit plan. Plaintiff seeks to recover benefits under the Plan, which meets the definition of "employee welfare benefit plan" as defined in 29 U.S.C. § 1002(1). As an employee of Aurora, the plan

sponsor, who was eligible to receive benefits under the plan, plaintiff qualifies as a "participant" as defined in 29 U.S.C. §1002(7). Venue properly lies in the Eastern District of Wisconsin, per 29 U.S.C. §1132(e)(2), as that is where the plan was administered. Additionally, plaintiff exhausted all required internal appeal mechanisms. (Defs.' Resp. Pl.'s PFF ¶ 2).

## B. Dismissal of Defendants

Shields brought suit against her employer (Aurora), her employer's LTD benefits plan, the independent administrator of the Plan (Matrix), and the administrator's parent company (Delphi). As defendants point out, courts have held that "ERISA permits suits to recover benefits only against the Plan as an entity." *Garratt v. Knowles*, 245 F.3d 941, 949 (7th Cir. 2001) (citing *Jass v. Prudential Health Care Plan, Inc.*, 88 F.3d 1482, 1490 (7th Cir. 1996). Defendants assert that "Shields has not alleged any facts that would establish individual liability on the part of Aurora Health Care, Inc., Matrix or Delphi Financial Group, Inc." (Defs.' Br. Supp. Mot. S.J. at 8). Plaintiff concedes that the Plan is the only proper defendant, and that the other defendants should be dismissed. (Pl.'s Resp. Defs.' Mot. S.J. at 1). The court, therefore, dismisses Matrix Absence Management, Inc., Aurora Health Care, and Delphi Financial Group, Inc. from this suit.

## C. Motions for Summary Judgment

### 1. Standards of Review

Summary judgment is appropriate where the moving party establishes that there is no genuine issue of material fact and that the party is entitled to

judgment as a matter of law. Fed. R. Civ. P.56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Material facts" are those facts which "might affect the outcome of the suit," and a dispute about a material fact is "genuine" if a reasonable finder of fact could find in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate where a party has failed to make "a showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. A party opposing summary judgment may not rest upon the mere allegations or denials of the adverse party's pleading, but must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). Any doubt as to the existence of a material fact is to be resolved against the moving party. *Celotex*, 477 U.S. at 331.

Having set forth the standard of review applicable to motions for summary judgment, the court must now turn to the standard of review applicable in ERISA cases. ERISA requires that plan procedures afford claimants a reasonable opportunity for "a full and fair review" of dispositions adverse to the claimant. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 830-31 (2003); 29 U.S.C. § 1133(2). If a plan gives the administrator discretionary authority to determine eligibility for benefits, the administrator's decision is to be reviewed under the deferential arbitrary and capricious standard. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Hackett v. Xerox Corp.*, 315 F.3d 771, 773 (7th Cir. 2003).

Here, Aurora's long-term disability plan appears to give the plan's administrator, Matrix, discretionary authority to determine eligibility for benefits. The summary plan description specifically states: "[t]he plan administrator has full discretionary authority to make decisions on eligibility for benefits under this plan and construe the terms of the plan for this purpose, and will do so without regard to any possible conflicting interests of Aurora Health Care, Inc. " (Defs.' Br. Supp. Mot. S.J. Ex. 1 at 17).  Though this language does not mirror the "safe harbor" language suggested by the Seventh Circuit Court of Appeals in order to ensure arbitrary and capricious review, it nonetheless succeeds in giving beneficiaries adequate notice that the administrator has discretion. *See Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 331 (7th Cir. 2000) (suggesting, but not requiring, that employers desiring to grant administrators discretion use the following "safe harbor" language in ERISA plans: "Benefits under this plan will be paid only if the plan administrator decides in his discretion that the applicant is entitled to them."); *see also Diaz v. Prudential Ins. Co. of Am.*, 424 F.3d 635, 639 (7th Cir. 2005) ("[T]he critical question is whether the plan gives the employee adequate notice that the plan administrator is to make a judgment within the confines of pre-set standards, or if it has the latitude to shape the application, interpretation, and content of the rules in each case.").   However, the summary plan description is not the final word on the matter for, as the Seventh Circuit Court of Appeals posited in *Health Cost Controls of Illinois, Inc. v. Washington*, 187 F.3d 703, 711 (7th Cir.1999), and as it reiterated in *Schwartz v. Prudential Ins. Co. of America*, it is the plan itself that governs whether or not the

Case 2:06-cv-01314-JPS   Filed 09/24/08   Page 11 of 25   Document 55

administrator has discretion. 450 F.3d 697, 699-70 (7th Cir. 2006). This holds true because it is the plan that constitutes the contract between provider and beneficiary; the summary plan description is merely an aid in helping beneficiaries understand the plan. The summary plan description does not have the legal authority to enlarge the administrator's authority. *Id.* at 700. In the instant case, the parties agree that the summary plan description constitutes the entire plan – thus, making it the last word on the matter. (Defs.' Resp. Pl.'s PFF ¶ 8). Accordingly, the court will review the plan administrator's decision under the arbitrary and capricious standard of review.

The arbitrary and capricious standard is the least demanding form of judicial review of administrative action, and any questions of judgment are left to the administrator of the plan. *Trombetta v. Cragin Fed. Bank for Sav. Employee Stock Ownership Plan*, 102 F.3d 1435,1438 (7th Cir. 1996). Under this standard, the court will uphold the denial of benefits so long as that decision has "rational support in the record." *Leipzig v. AIG Life Ins. Co.*, 362 F.3d 406, 409 (7th Cir. 2004). "Put simply, an administrator's decision will not be overturned unless it is 'downright unreasonable.'" *Davis v. Unum Life Ins. Co.*, 444 F.3d 569, 576 (7th Cir. 2006) (quoting *Sisto v. Ameritech Sickness & Accident Disability Benefit Plan*, 429 F.3d 698, 700 (7th Cir. 2005)).

### 2. Sufficiency of Defendant's Decision

Shields raises several arguments in an effort to show that Matrix's decision lacks rational support in the record. She claims "Shields was denied a 'full

and fair' review when Matrix had her appeal reviewed by a nurse rather than a physician." (Pl.'s Resp. Defs.' Mot. S.J. at 2). She claims "Matrix [i]mpermissibly [r]elies on [f]aulty [v]ocational [e]vidence." (*Id.* at 4). Lastly, she claims "Shields's [s]ymptoms [a]re [m]ore [t]han '[s]elf-[r]eported' and [s]ubjective." (*Id.* at 6). The court will examine each of these claims in turn to determine if any of them contain sufficient merit to warrant finding Matrix's denial of LTD benefits to be arbitrary and capricious.

### a.    Matrix's Use of a Nurse Rather than a Physician to Review Shields's Appeal

Shields takes issue on two basis with Matrix's decision to use Nurse Radach to review her appeal: 1) Radach "has no training, education or specialized knowledge specific to fibromyalgia" (*Id.* at 2) (citing Radach dep. at 9:23-10:2); and 2) using a nurse instead of a physician is inherently deficient. (Pl.'s Resp. Defs.' Mot. S.J. at 2). In support of her first point, Shields points to ERISA regulations that state:

> in deciding an appeal of any adverse benefit determination that is based in whole or in part on a medical judgment, . . . , the appropriate named fiduciary shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment.

29 C.F.R. 2560.503-1(h)(3)(iii). 29 C.F.R. 2560.503-1(h)(4) goes on to state that "claims procedures of a plan providing disability benefits will not, with respect to claims for such benefits, be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination

Case 2:06-cv-01314-JPS   Filed 09/24/08   Page 13 of 25   Document 55

unless the claims procedures comply with the requirements of [(h)(3)(iii)]."
Defendants attack this point on two fronts. First, Nurse Radach largely based his
decision on the Independent Medical Records Review conducted by Dr. Ladin. Dr.
Ladin is a physician, Board Certified in Physical Medicine and Rehabilitation, the
Subspecialty of Pain Medicine and Independent Medical Examination. (Pl.'s Resp.
Defs.' PFF ¶ 17). Thus, by using Dr. Ladin and relying mainly on his review, Matrix,
it is argued, did comply with 29 C.F.R. 2560.503-1(h)(3)(iii). Plaintiff takes issue with
this because Dr. Ladin himself is not a rheumatologist, thus, it is argued, his review
fails to comply with 29 C.F.R. 2560.503-1(h)(3)(iii) as well. (Pl.'s Br. Supp. Mot. S.J.
at 6). For support, plaintiff cites *Crespo v. Unum Life Ins. Co. of America,* which
states that an administrator acted arbitrarily and capriciously in part because there
was "nothing in the record to indicate that [the administrator's] in-house doctors ha[d]
any expertise in the area of fibromyalgia or pain management." 294 F. Supp. 2d 980
(N.D. Ill. 2003). Dr. Ladin may not be a rheumatologist but, as a medical doctor with
experience in pain medicine, he is amply qualified to review the records of
rheumatologists and other specialists and make an informed finding. *See Larque
v. SBC Communications Inc. Disability Income Plan, Core, Inc.*, WL 3447740 at 6
n.13 (W.D. Tex. 2005) (holding that it was not arbitrary and capricious for
administrator to rely on review by a medical doctor who was not a specialist in fields
of chronic pain, neck injuries, or carpal tunnel – as were plaintiff's treating
physicians). *See generally Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 607-08 (7th
Cir. 2007) (administrator's decision not arbitrary and capricious, even though it did

Case 2:06-cv-01314-JPS   Filed 09/24/08   Page 14 of 25   Document 55

not use rheumatologists to review file of claimant alleging disability as a result of numerous ailments, including fibromyalgia).

Defendants also attack plaintiff's critique of Matrix's use of Nurse Radach by asserting that the regulations found in 29 C.F.R. 2560.503-1(h)(3)(iii) do not apply to Radach's decision, because Radach's decision was not "based in whole or in part on a medical judgment."  Rather, Dr. Ladin made the medical judgment, Radach just applied Dr. Ladin's medical judgment to the terms of the plan.  To best understand the merit of this argument, it is crucial to note that a claimant must show not just diagnosis, but also disability. *See Boardman v. Prudential Ins. Co. of America*, 337 F.3d 9 (1st Cir. 2003) (discussing necessity of showing diagnosis as well as disability).  Defendants concede that Shields suffers from fibromyalgia. (Defs.' Br. Opp. Pl.'s Mot. S.J. at 7).  They assert that Nurse Radach was not making a medical judgment as to whether Shields had fibromyalgia, but was merely determining that given Dr. Ladin's finding, Shields was still capable of performing some jobs.  *See Stanford v. Cont'l Cas. Co.*, 455 F.Supp.2d 438, 445 (E.D. N.C. 2006) (review by specialist unnecessary where only question is whether the admitted medical diagnosis constitutes a disability as defined by the plan).

As for plaintiff's second assertion with reference to Nurse Radach's determinations – namely that use of a nurse to decide a claimant's appeal is never sufficient – this, like plaintiff's other argument regarding Nurse Radach, is unconvincing.  This argument by plaintiff is vulnerable to many of the same attacks as the previous argument – namely Dr. Ladin, not Nurse Radach, made the medical

Case 2:06-cv-01314-JPS   Filed 09/24/08   Page 15 of 25   Document 55

determinations that the decision was based on. Additionally, the Seventh Circuit Court of Appeals has upheld administrator's decisions, even where the final reviewer of the file was a nurse. *See Sperandeo v. Lorillard Tobacco Co., Inc.*, 460 F.3d 866, 875 (7th Cir. 2006); *Kobs v. United Wis. Ins. Co.*, 400 F.3d 1036, 1038 (7th Cir. 2005).

> **b.    Impermissibility of Matrix's Reliance on Mayer's Vocational Assessment**

Plaintiff alleges that Mayer's vocational report is "selective and incomplete because it relied exclusively upon Dr. Ladin's findings." (Pl.'s Resp. Defs.' Mot. S.J. at 4). Plaintiff alleges that Mr. Mayer did not even consider any of plaintiff's doctors' findings, but only relied on the finding of Dr. Ladin. (*Id.*). Indeed, upon reviewing Mr. Mayer's assessment, the court is struck by the complete dearth of reference by Mr. Mayer to plaintiff's numerous ailments. Defendants point out that the utilization of a vocational analysis is not required in the first instance. *See Migdal v. Aurora Health Care Inc.*, 2006 U.S. Dist. Lexis 72853, 16 (E.D. WI. 2006) (stating that there is not a "blanket requirement that plan administrators obtain independent vocational expert analysis"). Given the limited inquiry that is required to determine the transferrable skills of a claimant, it would be a stretch to say in and of itself that use of Mayer's assessment was arbitrary and capricious. *See Quinn v. Blue Cross and Blue Shield Ass'n*, 161 F.3d 472 (7th Cir. 1998) (stating that the administrator "was under no obligation to undergo a full-blown vocational evaluation of [claimant's] job, but she was under a duty to make a reasonable inquiry into the types of skills

Case 2:06-cv-01314-JPS    Filed 09/24/08    Page 16 of 25    Document 55

[claimant] possesses and whether those skills may be used at another job that can pay her the same salary range as her [prior] job."). However, the problem lies in Mr. Mayer's apparent sole reliance on Dr. Ladin's report. Were Dr. Ladin's report sufficient, then Mr. Mayer's reliance would be more acceptable but, as the court will now discuss, Dr. Ladin's report does not amount to substantial evidence.

### c. Shields's Symptoms Are More than "Self-Reported" and Subjective

Under the plan, disability must be established by "objective medical evidence" ("OME"). The plan defines OME as:

> A measurable independently observably [sic] abnormality which is evidenced by one or more standard medical diagnostic procedures including tests, clinical examinations or procedures that support the presence of a disability or indicate a functional limitation. Not all tests or test results meet the criteria for Objective Medical Evidence. Self reported symptoms are not considered objective and do not establish eligibility for benefits under this Plan.

(Debofsky Decl. Ex. A at 27).

Cases involving fibromyalgia inevitably always come back to the subjective nature of the affliction. The Seventh Circuit has described fibromyalgia as follows:

> Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and-the only symptom that discriminates between it and other diseases of a rheumatic character-multiple tender spots, more precisely 18 fixed

-17-

locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch.

*Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996). As Dr. Halverson attested, and defendants concede, plaintiff was diagnosed using the 18-point test, which is generally considered OME. *See Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 919 (7th Cir. 2003) *Chronister v. Baptist Health*, 442 F.3d 648, 656 (8th Cir. 2006). However, the trigger point test is OME of the diagnosis of fibromyalgia, not that a certain patient's fibromyalgia constitutes a disability. *See Sarchet,* 78 F.3d at 306; *Hawkins*, 326 F.3d at 919.

Defendants contend that although plaintiff presented OME of fibromyalgia, she did not produce OME of disability. However, the question before this court is not whether plaintiff is disabled, but whether defendants' decision that she is not was arbitrary and capricious. For this the court turns to Dr. Ladin's report. Dr. Ladin, after five pages of summarization of plaintiff's doctors' reports of her numerous ailments, then gave the following conclusion.

> [S]he appears to be suffering from fibromyalgia syndrome along with depression and irritable bowl syndrome. Records also document a history of migraine headaches. These conditions are not typically associated with any demonstrable objective abnormality, either on physical examination or diagnostic testing. They are characterized by a pattern of subjective symptomatology including areas of pain and tenderness. For this reason there would be no objective basis for concluding that Ms. Shields is currently disabled from any occupation.

Case 2:06-cv-01314-JPS   Filed 09/24/08   Page 18 of 25   Document 55

(Debofsky Decl. Ex. A at 61). The problem with Dr. Ladin's finding is not the fact that it is the opposite of Dr. Solliday-McRoy's and Dr. Halverson's conclusions as to whether she is disabled. (*Id.* Ex. E at 403-05). Indeed, this court has upheld an administrator's decision where the doctor the administrator hired came back with a different finding than that of the plaintiff's treating physicians. *See Migdal,* Lexis 72853 at 19-22. Rather, the problem with Dr. Ladin's report is that it is not based on his analysis of Shields's conditions, or his opinion regarding the opinions of her treating physicians, or any of his own observations (as he only conducted a records review). Instead, it is based on his conclusion that there cannot be OME of disability associated with fibromyalgia. This is indeed the position taken by defendants. Nurse Radach states that Dr. Halverson confirmed that Shields's fibromyalgia was diagnosed through the 18-point test; Radach then goes on to state that "[c]ase law has established that tender points are not considered [OME]." (Debofsky Decl. E at 401). As noted above, in the Seventh Circuit, as well as the Eighth Circuit, case law has established that the 18-point test is considered OME of fibromyalgia. It is clear from the record that Matrix's decision relied on three pieces of evidence: Dr. Ladin's report; Mr. Mayer's vocational report; and Nurse Radach's review. It is also clear that Nurse Radach's opinion was based on that of Mr. Mayer and Dr. Ladin; that Mr. Mayer's opinion was based entirely on the conclusion of Dr. Ladin; and that Dr. Ladin's conclusion was based on a belief that fibromyalgia cannot be proven to be disabling.

Dr. Ladin's report and conclusion are reminiscent of Dr. Chou's report in *Hawkins.* 326 F.3d 914. The court in *Hawkins* said that Dr. Chou's report evidenced an erroneous belief that because the plaintiff's complaints of fibromyalgia pain were subjective, that meant the plaintiff was not disabled. 326 F.3d at 919. Dr. Ladin's report evidences the exact same belief. Defendants, however, argue that since the plan is a contract, and since it requires OME of disability, then that means that the plan does not cover fibromyalgia, because disability from fibromyalgia cannot be proven with OME. (Defs.' Br. Opp. Pl.'s Mot. S.J. at 15). Defendants are right that fibromyalgia can be excluded from coverage; however, they are not correct in arguing that the present language of the plan accomplishes that end. A health plan is a contract, and any ambiguity in a contract is interpreted against the drafter of the contract. This court does not find that the present language in the plan at issue would put any would-be beneficiary on notice that there was no hope of receiving LTD benefits if that person were afflicted with fibromyalgia or chronic pain syndrome.

Ms. Shields presented conclusive evidence of fibromyalgia, and evidence of disability stemming therefrom. It is not for this court to say how convincing her evidence of disability was or was not. Rather, in this instance the court finds that Matrix's rationale for rejecting the finding and opinions of her doctors was arbitrary and capricious, as it was based entirely on Dr. Ladin's opinion that because disability from fibromyalgia is unprovable, Shields must not be disabled.

## III. CONCLUSION

Finally, plaintiff requests that this court restore her benefits, including a monetary award for those benefits ostensibly missed. For reasons which follow, the court is unable to make such an award as today's decision is limited to the matter of the arbitrary and capricious manner in which the Plan determined plaintiff's eligibility for long term disability benefits. Consequently, the court does not reach the question of whether plaintiff may actually be entitled to those benefits, for that remains a matter for further consideration and ultimate determination by the Plan after providing Ms. Shields a full and fair review of her claim for such benefits. To be clear, reinstatement of benefits is appropriate when such benefits have been terminated, not when they have been denied in the first instance.

As the court noted in *Hackett*, where the administrator's decision was arbitrary and capricious, the court should seek to restore the status quo. 315 F.3d at 776. Thus, where the benefits are *terminated* without adequate procedures, the plaintiff is entitled to reinstatement of benefits. *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 697 (7th Cir. 1992). However, where the "administrator did not afford adequate procedures in its initial denial of benefits, the appropriate remedy respecting the status quo and correcting for the defective procedures is to provide the claimant with the procedures that she sought in the first place." *Hackett*, 315 F.3d at 776.

Plaintiff alleges that although she received LTD benefits for two years under the "mental/nervous" provision, she "disagreed immediately with this classification and requested that her disability benefits continue based on her diagnoses of

fibromyalgia and chronic pain, and provided substantial medical evidence from examining physicians and treating physicians supporting her disability." (Pl.'s Resp. Defs.' PFF ¶ 13). This assertion is aimed at convincing the court that the decision she challenges in this case was a decision to terminate, rather than deny, benefits. However, the record before the court paints a different picture. Shields presented both psychological and physical problems when applying for LTD benefits in 2003; Matrix's approval for her LTD benefits in July 2003 was based solely on her litany of psychological problems. (DeBofsky Decl. Ex. C at 296-97). Thus, her benefits were classified as "mental/nervous." Under the Plan, in order to receive LTD benefits for more than twenty-four months under the "mental/nervous" provision, the recipient must be hospitalized or institutionalized at the end of the twenty-four month period. (Debofsky Decl. Ex. A at 9). Plaintiff was neither hospitalized or institutionalized when her "mental/nervous" benefits expired, thus those benefits validly expired, and she sought continuation of benefits under the "any occupation" provision. In doing so she relied on a different set of ailments than the ailments upon which her original benefits were awarded. Therefore, the decision presented to this court for review is not one where an administrator arbitrarily terminated ongoing benefits, but rather one where it arbitrarily denied an application for benefits.

Plaintiff also tries to suggest that Matrix was wrong to ever classify her benefits as "mental/nervous," thus, the present decision before the court is one of termination of benefits. This argument strains credulity given that plaintiff never appealed the award of benefits under the "mental/nervous" provision when it was

granted. To support her position, plaintiff cites *Ehrman v. Henkel Corp. Long Term Disability Plan*, for the proposition that a twenty-four month mental impairment limitation is "inapplicable to someone who is totally disabled physically and in addition, has mental disorders." 194 F. Supp. 2d 813, 820 (C.D. Ill. 2002); (Pl.'s Br. Supp. Mot. S.J. at 14). *Ehrman*, however, is completely inapposite. *Ehrman* is a case in which the court was reviewing an administrator's decision de novo – not under an arbitrary and capricious standard of review – and it is a case in which the court was making a finding not only as to the administrator's decision, but also as to the ultimate fact of the plaintiff's disability. 194 F. Supp. 2d at 818-20. The instant case is, as plaintiff concedes, subject to an arbitrary and capricious standard; thus the court is not going to, as a court reviewing de novo can, weigh the evidence and determine whether or not plaintiff meets the plan's definition of disabled under the "any occupation" provision.

Try as plaintiff may, there is no way to construe the decision now before the court as a termination of benefits rather than a denial of benefits. It is clear from the record: plaintiff sought disability benefits in 2003; Matrix granted "mental/nervous" benefits because of plaintiff's numerous psychological problems; and after plaintiff's "mental/nervous" benefits expired in 2005, plaintiff then applied for "Any Occupation" benefits based on her physical problems. Matrix denied her request for "any occupation" benefits. It was that decision that was arbitrary and capricious – not any decision having anything to do with her "mental/nervous" benefits. The proper

Case 2:06-cv-01314-JPS   Filed 09/24/08   Page 23 of 25   Document 55

remedy is remand with instructions that the plan administrator not make its decision in an arbitrary and capricious manner.

Additionally, plaintiff asks for an award of attorney's fees pursuant to 29 U.S.C. 1132(g), a provision of ERISA which allows the court, in its discretion, to award "reasonable attorney's fees and costs of action to either party." 29 U.S.C. 1132(g)(1). The question the court must ask itself is: "was the losing party's position substantially justified and taken in good faith, or was that party simply out to harass its opponent?" *Meredith v. Navistar Intern. Transp. Corp.*, 935 F.2d 124, 128 (7th Cir.1991). Given the extreme pro-plan bias inherent in ERISA, as well as the deferential standard of review ensured by the language of the Plan, it would require a rather extreme case for the Plan to not reasonably believe it would prevail. The instant case is no different. Indeed, if Dr. Ladin or Matrix had based their decision on refutations of plaintiff's doctors findings, or on findings of their own, rather than on a single absolutism, defendants would have prevailed. Accordingly, the court finds that the Plan's position was taken in good faith, and, therefore, it would be inappropriate to award attorney's fees.

Accordingly,

**IT IS ORDERED** that Matrix Absence Management, Inc., Aurora Health Care, and Delphi Financial Group, Inc.'s request for dismissal be and the same is hereby **GRANTED**, and

-24-

**IT IS FURTHER ORDERED** that Aurora Health Care Long Term Disability Plan's Motion for Summary Judgment (Docket #30) be and the same is hereby **DENIED**, and

**IT IS FURTHER ORDERED** that Linda Shields's Motion for Summary Judgment (Docket #26) be and the same is hereby **GRANTED** upon the court's finding that her claim for long term disability benefits was arbitrarily and capriciously denied and, therefore, she is entitled to a redetermination of eligibility for such benefits after a full evaluation of all relevant evidence related to her claim.

**IT IS FURTHER ORDERED** that this action is hereby **DISMISSED** and the plaintiff is awarded costs as taxed by the clerk of court.

The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 24th day of September, 2008.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge